## UNITED STATES *v.* F. W. WOOLWORTH Co. (No. 4306)[1]

United States Court of Customs and Patent Appeals, October 28, 1940

*Charles D. Lawrence*, Acting Assistant Attorney General (*John J. McDermott*, special attorney, of counsel), for the United States.

*Sharretts & Hillis* (*Edward P. Sharretts* of counsel), for appellee.

[Oral argument October 4, 1940, by Mr. McDermott and Mr. Sharretts]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

BLAND, Judge, delivered the opinion of the court:

The United States has here appealed from a judgment of the United States Customs Court, First Division, which sustained the protest of the importer, appellee, against the collector's classification of and assessment with duty upon metal figures, more particularly hereinafter described, at the rate of 70 per centum ad valorem under paragraph 1513 of the Tariff Act of 1930. In the importer's protest it was claimed that the merchandise was dutiable under paragraph 397 of said act at 45 per centum ad valorem as manufactures of metal.

The pertinent parts of the two competing paragraphs are as follows:

PAR. 397. Articles or wares not specially provided for, * * *; if composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal, but not plated with platinum, gold, or silver, or colored with gold lacquer, whether partly or wholly manufactured, 45 per centum ad valorem.

PAR. 1513. Dolls * * *; doll heads, toy marbles, toy games, toy containers, toy favors, toy souvenirs, of whatever materials composed, air rifles, toy balloons, toy books * * * garlands, festooning .and Christmas tree decorations * * * and all other toys, and parts' of toys, not specially provided for, 70 per centum ad valorem. As used in this paragraph the term

---

[1] C. A. D. 145.

"toy" means an article chiefly used for the amusement of children, whether or not also suitable for physical exercise or for mental development. The rates provided for in this paragraph shall apply to articles enumerated or described herein, whether or not more specifically provided for elsewhere in this Act.

The merchandise involved consists of miniature metal figures of animals and other objects—dogs, horses, and other animals, carts, wheelbarrows, and men, women, and boys shown as handling different tools and objects and engaged in different enterprises. The objects are brightly colored, are made of metal, and it is stipulated that they are not plated with platinum, gold, or silver, or colored with gold lacquer.

The collector in classifying the merchandise seemed to be in some doubt as to whether the articles should be regarded as toys under the definition of that word in the statute, and made the following unusual statement concerning the matter:

The liquidation of entry 729932 of February 20, 1939, has been reviewed in the light of the claim made in the above mentioned protest, in accordance with Section 514, Tariff Act of 1930. From photographs of the merchandise exhibited, which bore numbers identifying the various articles with those on the invoice, it appears that the merchandise consists of small metal figures, representations of objects, chiefly animate objects. They are similar in construction and appearance, and were believed intended for use in the same manner as toy soldiers. The effort of educators and peace organizations to substitute representations of peaceful occupations for military toys is a matter of common knowledge. The type of figure here imported is now specially provided for at 45% ad valorem under paragraph 1513, as amended by the trade agreement with the United Kingdom, T. D. 49753, January 1, 1939.

Certain figures, such as conductors, engineers, porters, and travelers are used by children in conjunction with electric train layouts. The farms and villages with workmen and the domestic animals are similarly used, as are the Indians, wild animals, skiers, sailors, etc. The figures are sometimes used by children for decorative purposes in their nurseries. They may also be used for other decorative purposes in homes where there are children, and perhaps even in homes where there are not children. *How extensive such other uses may be can be determined only by competent evidence.* [Italics ours]

In the absence of evidence as to which, if any, of these figures is not chiefly used for the amusement of children, our classification under paragraph 1513 is adhered to.

Notwithstanding the above findings by the collector, we think the burden of proof was upon the importer to show by proper evidence that the chief use of the merchandise was other than for the amusement of children; the parties hereto have so accepted the issue. It is contended by the importer that the overwhelming weight of the evidence clearly supports the finding of the court below to the effect that the chief use of the class of merchandise which is at bar was other than that of the amusement of children. The Government contends that the testimony it introduced overcame the testimony of the importer and that the weight of the competent, material

and relevant testimony should have required the trial court to have found in favor of the classification of the collector.

The importer took the testimony of 30 witnesses, one of whom identified the merchandise, another, a photographer, identified certain photographs illustrative of the use of the involved merchandise, and the remaining 28 testified as to the use and character of the merchandise involved and similar merchandise. The Government introduced the testimony of 12 witnesses, all of whom testified as to the use of merchandise like that at bar.

We have carefully read the evidence, but it would serve no useful purpose to repeat here in detail the testimony of each witness. We think it sufficient to say that the testimony of the importer's witnesses, without material exception, shows that the articles at bar, on the date of importation, and similar articles, imported for several years prior thereto, were chiefly used throughout the United States for purposes other than the amusement of children.

The Government's witnesses included five New Jersey housewives who testified in substance that they had seen children, including those of some of the mothers testifying, play with articles like the miniature figures at bar, and that the children seemed to derive amusement from such play; that the children arranged the articles in the form of little villages, with stores, parks, etc. Some of the Government's witnesses testified they never saw adults use the figures. One or more of the Government's witnesses testified that they trained children in schools for children of tender age and that they used similar figures to amuse and train them by building various kinds of displays. One of the Government's witnesses testified that she never saw such articles "used as ornaments or knickknacks standing on mantels over fireplaces in homes or apartments." Another one, an acting examiner of toys and novelties at the port of New York, testified that he had seen articles like those at bar used by children 6 or 8 years of age; that he had never seen adults use them, and that he had seen them on display at the toy counters in F. W. Woolworth Co. stores.

One of the Government's witnesses, William J. Thompson, testified that he had been a buyer for the Woolworth Co. for a period of 19 years; that during the period of the last 15 years he had acted as a buyer for toys, ornaments, decorations and novelties; that he had bought articles like those at bar for a period of 6 or 7 years and that the stores were not concentrated in any certain area but were distributed "pretty uniform throughout the United States on the whole * * * in all the principal cities"; that the purchase of this kind of article started in a small way at the beginning; that he made practically all the purchases for his company in 1935 of this kind of article, at which time he would estimate that their value was five or six thousand dollars;

that in the year 1936 the amount of purchases had increased by 50 per centum; that in 1937 there was a "big increase"; that he bought about eighteen to twenty thousand dollars' worth in that year; that in 1938 there was approximately 124,000 dozen, of which 100,000 dozen went to Manhattan and Philadelphia, and the remainder to the balance of the United States; that in 1939 he purchased approximately 201,000 dozen, and that 124,000 dozen went to Philadelphia and Manhattan, the rest to the balance of the United States; that all these purchases were made by the F. W. Woolworth Co. and that he had found very few items like these in any other stores, and that he did not recall seeing any of them in other stores. He accounted for the enormous increase during the years mentioned as follows:

The only way I can account for it is the increased demand for these novelties, to be used in making displays and for ornaments and so on and so forth. It is my impression that during the past few years there has been a fad to use items of this kind for decorative purposes, to put on mantels and on tables, and so on and so forth. In fact I have seen them in homes.

We quote further from his testimony:

X Q. How were they being used when you saw them?—A. Well, I have seen them on mantels as decorative articles; I presume they are considered novelties that were pleasing to the eye. I have seen them made into little villages for display purposes. That is, not as a permanent fixture, and I have seen them used under the Christmas tree for decorative purposes, to make mountain scenes, and in fact villages and so on and so forth, to give the Christmas tree the appearance of being out in its natural state.

X Q. These decorative uses that you speak of, was that all by adults or by children?—A. By adults.

 *     *     *     *     *     *     *

X Q. As I understand it, whatever the majority of the demand and use, has been here in the East, is that correct?

Mr. McDermott. I object, I don't think the witness is qualified.

Mr. Sharretts. He testified as to Manhattan.

Judge Sullivan. He can only say yes or no. He said Manhattan and Philadelphia take about three-fourths of the importation, and the rest of the country is about one-quarter. It is already in the record. It is merely repetition.

The miniature figures at bar are of metal, rather heavy for their size and are obviously the kind of article that would be used in various kinds of displays where it was essential to have such objects of a size to be proportionate with the other articles shown. The record is replete with a showing that adults use them for mantel, whatnot and corner-shelf ornaments which are above the reach of children and that they are never intended, when purchased, to be used by children. The testimony of some of the witnesses is to the effect that a great many of them are used by collectors, such as in collections of horses, elephants, various other kinds of animals, as well as other objects. Other important uses are as ornaments for miniature Japanese gardens and in terrariums (glass globes in which there are earth, plants and figures). Some of the witnesses testified to use by model engineering

societies who find it important to illustrate, by articles representing animate and inanimate objects, how a landscape or design structure would appear when completed:

From the testimony as a whole we think it appears clearly that these comparatively heavy metal articles are not of the class or kind of miniature objects which are designed to be used or are used to any great extent for the amusement of children in the sense that a toy would amuse them. An examination of the articles themselves tends strongly to support the conclusion that they are not toys in a statutory sense and that at no time were they ever chiefly used, or belonged to a class which was chiefly used, for the amusement of children. In arriving at this conclusion, we have been aided to a great extent by the careful and able manner in which the testimony was analyzed by the trial court. After having carefully discussed the evidence, the decision below recites:

* * * It will be observed that the weight of this testimony indicates that these articles are not used chiefly for the amusement of children. Their use by children may interest and entertain them, but that is not such amusement as would be obtained by them in playing with a doll, a ball, a top, and similar playthings. The weight of the testimony establishes that their predominant uses are in decoration, building farm, railroad, garden, and similar scenes; by teachers for educational purposes; and as decorations under Christmas trees. Their suitability for such uses is confirmed by the samples themselves, which are very lifelike miniature figures of men and women, animals, trees, bridges, wells, donkeys, drawing carts, windmills, chickens, benches, gates, fences, ponds, buffaloes, Indians, and miniature figures of a smililar nature made of metal and colored in an appropriate manner.

* * * In this case after carefully considering all the facts we believe that the weight of the testimony establishes that this merchandise is not used chiefly for the amusement of children, but for the various purposes heretofore mentioned.

Upon the instant record we are not convinced that the finding of the trial court is contrary to the weight of the evidence. On the contrary we believe the record amply supports the conclusion reached, and the judgment appealed from is affirmed.